IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**VICTORIA YVONNE BENAVIDEZ,**

        **Plaintiff,**

vs.                                                                                            CIV NO. 09-0621 CG

**MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO REVERSE OR REMAND

THIS MATTER is before the Court on Plaintiff's *Motion to Reverse and Remand for a Rehearing with Supporting Memorandum* (Doc. 16) ("*Motion*"), filed on November 13, 2009. The parties consented to have the undersigned magistrate judge conduct all proceedings and enter final judgment. (Docs. 4, 7.) The Court has reviewed Plaintiff's *Motion* (Doc. 16), *Defendant's Response to Plaintiff's Motion to Reverse and Remand* ("*Response*") (Doc. 19), Plaintiff's *Reply to Defendant's Response to Plaintiff's Motion to Reverse and Remand* ("*Reply*") (Doc. 20), and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record ("R."). Because the Administrative Law Judge (ALJ) did not make adequate findings regarding the impact of Ms. Benavidez' obesity on her mental impairments and because substantial evidence does not support the ALJ's adoption of the non-examining medical opinions, the Court will **GRANT** Plaintiff's Motion and, pursuant to 42 U.S.C. § 405(g) (sentence four), **REMAND**

1

the case to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

## Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760. An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. While a court may not re-weigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the

evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### **Applicable Law and Sequential Evaluation Process**

For purposes of disability insurance benefits (DIB) and supplemental security income (SSI), a person establishes a disability when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a).

In light of this definition for disability, a five-step sequential evaluation process (SEP) has been established for evaluating a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that:  (1) she is not engaged in "substantial gainful activity;" and (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) her impairment(s) either meet or equal one of the "Listings"[1] of presumptively disabling impairments; or (4) she is unable to perform her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering her

---

[1] 20 C.F.R. pt. 404, subpt. P, app. 1.

residual functional capacity (RFC), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

## Background

The Plaintiff, Ms. Benavidez, was born on May 6, 1970 (R. at 102). She has high school education and some college (R. at 41, 138), and she has worked as a customer service representative and lead logistics coordinator (R. at 22, 31, 33, 135, 171). On September 22, 2006, Ms. Benavidez applied for a period of disability and DIB and for SSI, alleging a disability-onset date of August 1, 2005. (R. at 105–07 (DIB); 102–04 (SSI).) Her applications were denied initially (R. at 61–64; *see* R. at 14) and upon reconsideration (R. at 70–73 (DIB); 74–77 (SSI)). Ms. Benavidez requested a hearing, which took place before ALJ George W. Reyes. (R. at 78 (request); R. at 25–56 (hearing transcript).) Ultimately, ALJ Reyes found that Ms. Benavidez was not disabled at step five of the five-step SEP. (R. at 23.)

At step one, the ALJ found that Ms. Benavidez had not been engaged in substantial gainful activity since her alleged onset date of August 1, 2005. (R. at 16.) The ALJ, therefore, proceeded to the next step.

At step two, the ALJ found that Ms. Benavidez had three severe, medically determinable impairments: (1) anxiety disorder, (2) panic disorder with agoraphobia, and (2) morbid obesity. (R. at 17.) Because the ALJ found that Ms. Benavidez had at least one severe, medically determinable impairment, he proceeded to the next step.

At the third step, the ALJ found that none of the step-two impairments, alone or in combination, met or medically equaled any of the Listings found in 20 C.F.R. § 404, subpt. P, app. 1. (R. at 17.) Specifically, he explained that there was "no evidence that

[Ms. Benavidez'] obesity has increased the severity of any co-existing impairments *to the extent that* the combination of impairments meets or medically equals the criteria of a Listing Section." (R. at 17 (emphasis added).) If any Listing had been met or medically equaled, the ALJ would have found Ms. Benavidez disabled at this step. (*See* R. at 15.) Because the ALJ did not find that any Listing was met, he proceeded in the SEP.

Before step four, the ALJ determined Ms. Benavidez' RFC. He found that, with some additional restrictions, Ms. Benavidez was capable of performing "light work."[2] (R. at 18.)

> I find that the claimant has the following residual functional capacity: the ability to perform light level work; she is limited to simple tasks not performed in a fast paced environment; she can concentrate for up to two hours at a time; and she is

---

[2] Social Security explains "light work" as follows.

> *Light work*. The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.
>
> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

Social Security Ruling (SSR) 83-10, 1983 WL 31251 at **5–6 (1983) (citing 20 C.F.R. §§ 404.1567(b), 416.967(b)).

>limited to [the] kind of jobs that would essentially be isolated with only occasional supervision.

(R. at 18.) To support this RFC, the ALJ found that Ms. Benavidez's complaints of anxiety, panic, concentration and memory problems, and fear of falling were not credible. (R. at 18, 21–22.) As further support, the ALJ explained that he rejected the opinions of the treating physician, Dr. Hauser, and the agency examiner, Dr. Padilla, because they were not consistent with or supported by the medical evidence and because Ms. Benavidez actually functioned at a higher level than they indicated. (R. at 22; *see* R. at 19–22.) Instead, he adopted the opinions of Drs. Chiang and Gabaldon, the non-examining, agency consultants. (R. at 21.) In explaining the RFC, the ALJ did not mention Ms. Benavidez' obesity or its effects on her mental impairments. (See R. at 18–22.)

At step four, the ALJ found that Ms. Benavidez did not have the RFC to return to her past relevant work. (R. at 22.) The ALJ, therefore, proceeded to step five. At the fifth and final step, considering Ms. Benavidez' age, education, work experience, and RFC, as well as the testimony of the vocational expert (VE)—which was premised on the RFC, *compare* (R. at 50–52 (hypothetical)) *with* (R. at 18 (RFC))—the ALJ found that there are jobs in the national economy in significant numbers that Ms. Benavidez could perform, such as shipping/weigher or laundry folder. (R at 23.) The ALJ, therefore, found that Ms. Benavidez was not disabled as defined in the Social Security Act at any time from the alleged onset date, August 1, 2005, through the date of the decision, January 20, 2009. (R. at 24.)

On January 25, 2009, Ms. Benavidez requested review of the ALJ's decision by the Appeals Council (R. at 9–10), which was denied on May 27, 2009 (R. at 1–3). ALJ Reyes'

decision, therefore, is the final decision of the Commissioner, and Ms. Benavidez' claim is ripe before this Court. *See* 42 U.S.C. § 405(g) (judicial review available after "final decision of the Commissioner").

### Medical Evidence

The record reflects evidence of morbid obesity and treatment for anxiety, panic, and agoraphobia. On November 29, 2006, Eligio R. Padilla, Ph.D., a consultative examiner for the agency, completed a psychiatric evaluation of Ms. Benavidez, and he evaluated her ability to do work related activities. (R. at 187–95.) Dr. Padilla noted that Ms. Benavidez was five feet and six inches tall and that she reported weighing about 300 pounds. (R. at 188.) He diagnosed her with Anxiety Disorder, Not Otherwise Specified (NOS) and obesity, and he opined that her global assessment of functioning (GAF) at the time was 50.[3] (R. at 190.) Dr. Padilla also assessed her functional limitations as follows: Based on "anxiety that disrupts learning and memory," Ms. Benavidez' ability to understand and remember detailed or complex instructions was "mildly limited," and to understand and remember very short and simple instructions was "not limited." *Id.* Due to "anxiety disorder that disrupts concentration and task persistence," Ms. Benavidez' ability to carry out instructions was "markedly limited," and her ability to attend and concentrate and to work without supervision was "mildly limited." *Id.* Her social interactions and ability to interact with people, including coworkers, were "markedly limited" as a result of her "anxiety disorder, including signs of agoraphobia." *Id.* Dr. Padilla also determined that

---

[3] The GAF is a determination using a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (Text Revision 4th ed. 2000). A GAF score of 50 indicates "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

Ms. Benavidez' "anxiety disorder, including signs of agoraphobia, [and] fear of driving" caused her ability to adapt to changes in the workplace and to use public transportation to be "markedly limited" and her ability to be aware of normal hazards to be "mildly limited." (R. at 191.)

On December 12, 2006, Elizabeth Chiang, M.D., completed a Psychiatric Review Technique (PRT) form as well as a Mental RFC Assessment. (R. at 197–214.) Acknowledging Ms. Benavidez' Anxiety Disorder, Dr. Chiang determined that Ms. Benavidez had not had any episodes of decompensation, "mild" limitations in social functioning and in concentration, persistence, and pace and that she had "moderate" limitations in social functioning. (R. at 207.) Like Dr. Padilla, Dr. Chiang also evaluated Ms. Benavidez' ability to understand and remember, to sustain concentration and persistence, to socially interact, and to adapt, but Dr. Chiang's results were much different. In every area, Dr. Chiang found that either there was "no evidence of limitation" or that the limitations were "not significant[]." (R. at 211–12.) She did determine, however, that Ms. Benavidez had "moderate" limitations in working in coordination with or in proximity to others without becoming distracted; in interacting appropriately with the public; in getting along with coworkers without distracting them or exhibiting behavioral extremes; in responding appropriately to changes in the work setting; and in traveling to unfamiliar places or using public transportation. *Id.* Dr. Chiang explained that Dr. Padilla's assessment of marked limitations was "not supported by the mental status exam." (R. at 213 (apparently referring to R. at 188–89).) Further, Dr. Chiang stated that Ms. Benavidez "can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-

workers and supervisors, and respond appropriately to changes in a routine work setting." (R. at 213.) On April 24, 2007, J. LeRoy Gabaldon, Ph.D., "affirmed" Dr. Chiang's assessments. (R. at 218.)

The record also includes treatment notes, which are dated from February 1, 2007 through July 31, 2008, from Rio Rancho Family Health Center. (R. at 223–315.) Ms. Benavidez was treated at Rio Rancho by a psychiatrist, Charles Hauser, M.D., as well as other staff. *Id.* On March 26, 2007, Dr. Hauser assessed Ms. Benavidez' GAF as 65.[4] (R. at 267.) After seeing Ms. Benavidez about ten times, Dr. Hauser completed a "Medical Source Statement of Ability to Work-Related Activities (Mental)" on July 31, 2008. (R. at 314–15; *see* R. at 265–67, 264, 263, 262, 261, 259, 260, 222, 258, 269, 257, 256.) Dr. Hauser concluded that Ms. Benavidez' impairment did not affect her ability to understand, remember, and carry out instructions. (R. at 314.) He further opined that she was "moderate[ly]" restricted in interacting appropriately with the public and "marked[ly] restricted in interacting appropriately with supervisors and co-workers, in responding appropriately to work pressures in a usual work setting, and in responding appropriately to changes in a routine work setting. *Id.* Dr. Hauser attributed these restrictions to her panic disorder, which causes "sweating, [illegilble], [shortness of breath] and fears episodically related to pressure, anxiety, crowds." (R. at 315.)

## **Analysis**

Ms. Benavidez presents several faces of a central argument: that in the RFC, the ALJ failed to evaluate the effect of her obesity on her functional limitations. (Pl.'s Mot.,

---

[4] A GAF score of between 61 and 70 indicates "some difficulty in social, occupational, or school functioning . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34.

9

Doc. 16 at 3–4.)  For example, in addition to this overarching issue, she also argues that the ALJ failed his duty to develop the record on the effects of her obesity (*id.* at 4), that there was no positive evidence to support the ALJ's finding that she was capable of light work (*id.* at 5), and that the ALJ improperly relied on the VE's testimony (*id.* at 12–13).  All of these arguments flow from the central error that she asserts.  The ALJ's resolution of the overarching error, therefore, will necessarily address the related issues.  Beyond this central allegation of failure to evaluate her obesity and its related claims, Ms. Benavidez also asserts that the ALJ erred in rejecting the opinion of her treating physician (*id.* at 11) and that he improperly evaluated her credibility (*id.* at 13–14).  The Court will address the arguments in order of analytical convenience.

### I.  The RFC Evaluation of the Effects of Obesity

Obesity, like other impairments, is evaluated by the Commissioner according to the SEP, which is described above.  SSR 02-1p, 2000 WL 628049 at *3 (2002).  Medical guidelines classify obesity according to a person's Body Mass Index (BMI), which is calculated according to the individual's height and weight.  *Id.* at *2.  For women and men alike, a BMI of 40.0 or higher indicates "extreme obesity" and the "greatest risk for developing obesity-related impairments . . . ."  *Id.*

Although BMI classifies the level of obesity in the medical context, BMI itself is not determinative of "severity" at step two of the SEP in the social security context.  *Id.* at *4.  Instead, severity at step two is determined by the "*impact of obesity on . . . functioning.*"  *Id.* (emphasis added).    Obesity is considered severe at step two "when, alone or in combination with another medically determinable . . . impairment, it *significantly limits an individual's . . . ability to do basic work activities.*"  *Id.*  On the other hand, obesity "is 'not

severe' only if it . . . has no more than a minimal effect on the individual's ability to do basic work activities . . . ." *Id.* (emphasis added).  In some cases, obesity can cause such severe limitations in functioning that it alone may render a person disabled.  *Id.* at *5.  For example, when a person's obesity meets or equals a Listing at step three, the person will be considered disabled.  *Id.*  In other cases, however, obesity may be severe at step two but not meet or equal a Listing at step three, and the Commissioner therefore, will continue with the SEP and "will consider any functional limitations resulting from the obesity *in the RFC assessment*, in addition to any limitations resulting from any other physical or mental impairments that [he] identif[ies]."  *Id.* at *7 (emphasis added).

Here, there is no dispute that Ms. Benavidez is morbidly obese.  At the hearing, she testified that her height was five feet and five-and-a-half inches tall and her weight was 350 pounds.[5]  (R. at 31.)  In fact, the ALJ found that Ms. Benavidez' morbid obesity was severe at step two.  The overarching issue, which encompasses the other obesity-related arguments, is the ALJ's consideration of Ms. Benavidez' functional limitations resulting from her obesity and from its impact on her step-two mental impairments.  The consideration of Ms. Benavidez' obesity and its effect on her other step-two impairments affects—and in fact is determinative of—several of her arguments.

The Court finds that the ALJ erred when he failed to discuss the effects of Ms. Benavidez' obesity on her other step-two impairments in his RFC assessment.  At step two, when he determined that her morbid obesity was severe, he also necessarily found

---

[5] According the Centers for Disease Control and Prevention, an adult with such height and weight has a BMI of 57.4.  CDC.gov, Adult BMI Calculator, http://www.cdc.gov/healthyweight/ assessing/bmi/adultbmi/ english_bmi_calculator/bmi_calculator.html (last visited June 21, 2010).

that her obesity significantly limited her ability to do basic work activities.  *See* (R. at 4); SSR 02-1p, 2000 WL 628049 at *4.  The ALJ went on to explain why neither her obesity itself nor her obesity in combination with her other step-two impairments met or equaled a Listing.  (R. at 4.)  The ALJ's obesity analysis, however, ended there.  That is, at step two, he found that her obesity caused work-related functional limitations, but at the RFC, he did not explain what they were.  It is unclear whether any of the limitations assessed in the RFC were attributable to obesity.  If any were so attributable, it is unclear which, or on what evidence the ALJ relied in making such a finding.  On remand, therefore, the Commissioner should address Ms. Benavidez' obesity-related functional limitations in the RFC.  Such explanation will necessarily affect other arguments made by Ms. Benavidez.

### a. Development of the Record

Ms. Benavidez argues that because the record clearly established her obesity and because there was no evaluation "from a medical doctor" specifically evaluating the impact of her obesity on her functioning, the ALJ had a duty to "develop the record."  (Pl.'s Mot. Doc. 16 at 4.)  More specifically, it appears that she asserts that the ALJ erred in not ordering a consultative examination (CE) on the issue. Id.  The Commissioner responds that because Ms. Benavidez had the "ultimate burden of proving her disability[,] she ha[d] the duty to furnish . . . evidence that the ALJ [could] use to reach a conclusion about an impairment and its effect on [her] ability to work."  (Def.'s Resp., Doc. 19 at 7.)

"To be sure, administrative disability hearings are nonadversarial[,] and the ALJ has a duty to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.  Further, this duty pertains even if the claimant is represented by counsel."  *Wall v. Astrue*, 561 F.3d 1048, 1062–63 (2009) (citations, internal

quotation marks, and ellipsis omitted). The ALJ, however, is not required to act as Plaintiff's advocate in order to meet his duty to develop the record. *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993).

One way that an ALJ may develop the record is to order a CE, and he has "broad latitude" in determining whether or not to order a CE. *Hawkins v. Chater,* 113 F.3d 1162, 1166 (10th Cir. 1997). An ALJ has a duty to order a CE when "the need for one is clearly established in the record." *Id.* at 1168. Such need is clearly established when "evidence in the record establishes a 'reasonable probability' of the existence of a disability and the result of the [CE] could reasonably be expected to be of material assistance in resolving the issue of disability." *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). A CE is often required "where there is a direct conflict in the medical evidence requiring resolution or where the medical evidence in the record is inconclusive." *Hawkins*, 113 F.3d at 1166.

Ms. Benavidez argues that the ALJ erred in failing to develop the record on the issue of the effects of her obesity and, apparently, that he erred in failing to order a CE. The record, however, does indicate that the ALJ made some effort to develop the record with respect to her obesity. Specifically, at the hearing, the ALJ solicited testimony from Ms. Benavidez regarding her obesity and its effects on her functioning. (R. at 45–47.) Ultimately, the ALJ determined that the evidence was clear enough to find that her obesity was severe at step two and did not meet or equal a Listing at step three. (R. at 4.) The ALJ determined that there was sufficient evidence for him to make some findings on the disputed issue. It is possible then, that the ALJ will also find that the evidence is sufficient to make or explain his RFC findings with respect to her obesity. Or, the ALJ may discover, in attempting to make or explain his RFC findings, that the evidence is inconclusive or

conflicting, and he will further develop the record. Without the benefit of findings regarding the effects of Ms. Benavidez' obesity on her RFC, it would be premature for the Court to determine whether the evidence was inconclusive or conflicting—especially because the ALJ's decision indicates that he already found that it was *not* inconclusive or conflicting—and, thereby, determine whether the ALJ erred in failing to order a CE.[6]

### b. The RFC Finding that Ms. Benavidez Could Perform Light Work

Ms. Benavidez argues that "[b]ecause this is a step[-]five case, it clearly was the Commissioner's duty to come forth with [positive evidence to support his light-work finding]." (Pl.'s Reply, Doc. 30 at 2–3; *see* Pl.'s Mot., Doc. 16 at 5.) The Commissioner responds that Ms. Benavidez and her non-attorney representative had the duty to furnish medical evidence regarding her limitations or to indicate that the medical evidence of record was insufficient. (Def.'s Resp., Doc. 19 at 7.) The ALJ's finding that Ms. Benavidez could perform light work is part and parcel of his RFC findings. As explained above, the Court will remand the case for the Commissioner to make or explain any RFC findings on the effects of Ms. Benavidez's obesity, and such RFC findings will also necessarily address the light-work finding.

---

[6] The parties also dispute whether the ALJ's duty to develop the record was affected by Ms. Benavidez' representation at the administrative level by a non-attorney representative. Ms. Benavidez argues that because she did not have a licensed attorney, the ALJ's duty was heightened, and the Commissioner argues that she did have an "experienced, accredited Social Security representative." (Pl.'s Mot., Doc. 16 at 4; Def.'s Resp., Doc. 19 at 5–7 and Ex. A, Doc. 19-1 at 1–3; Pl.'s Reply, Doc. 20 at 1–2.) Until the ALJ makes or explains his findings regarding the effects of Ms. Benavidez' obesity on her RFC, it is unclear whether the record required further development. The Court, therefore, need not reach the issue of whether the ALJ's duty was affected by the involvement of the non-attorney representative at this time.

### c. Reliance on VE Testimony

Ms. Benavidez argues that the ALJ erred in failing to "discuss" the non-attorney representative's hypothetical to the VE, which included all of the restrictions assessed by Drs. Padilla and Hauser (Pl.'s Mot., Doc. 16 at 12–13), and instead relying on another hypothetical, which did not reflect such restrictions, and was therefore, "incomplete." (Pl.'s Reply, Doc. 20 at 4). The Commissioner asserts that the ALJ did not err because the hypothetical response on which he relied was supported by substantial evidence and because the other hypothetical response was not supported by substantial evidence and was inconsistent with the record. (Def.'s Resp., Doc. 19 at 10.)

Hypotheticals "must include all (and only) those impairments borne out by the evidentiary record." *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995). Furthermore, an ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). A reviewing court, however, does not make its own factual findings in social security appeals because fact-finding is the province of the Commissioner. *Evans*, 55 F.3d at 532. As the fact-finder for the Commissioner, an ALJ need only include in his hypothetical those limitations that he *found* were established by the evidence. *Id.* (emphasis added).

Here, the hypothetical response, on which the ALJ relied, mirrored the RFC, *compare* (R. at 50–52 (hypothetical)) *with* (R. at 18 (RFC)), and Ms. Benavidez does not argue otherwise. Rather, she argues that the ALJ erred in both (1) failing to specifically discuss and (2) failing to rely on the other hypothetical response, which was solicited by her

non-attorney representative and which included all of the restrictions assessed by Drs. Padilla and Hauser.

The Court has found that the RFC lacks findings or explanations related to Ms. Benavidez' obesity. The hypothetical, which mirrors the deficient RFC, is therefore also dubious. It is not clear that the hypothetical included all of the limitations borne out by the record, specifically those related to obesity. On remand, however, the findings or explanations in the RFC regarding obesity should clarify the issue. Ms. Benavidez also seems to assert that certain restrictions were borne out by the record and that, therefore, the ALJ erred in omitting them. The Court is not prepared to go further and factually determine which restrictions *were* borne out by the record. Such a determination may be affected by the proper evaluation and explanation of the obesity-related limitations and is properly left to the Commissioner.

## II. Evaluation of Dr. Hauser's and Dr. Padilla's Opinions

Ms. Benavidez argues that the ALJ's reasons for rejecting the opinions of her treating physician, Dr. Hauser, and the agency's consultative examiner, Dr. Padilla, are "not adequate." (Pl.'s Mot., Doc. 16 at 11.) The Commissioner responds that the ALJ's RFC, and therefore also his evaluation of the medical opinions, is supported by substantial evidence. (Def.'s Resp., Doc. 19 at 8–9.) Like the arguments above, the ALJ's evaluation of the medical opinions cannot be supported by substantial evidence because, as it is, it fails to account for the functional effects of Ms. Benavidez' obesity.

Here, the ALJ rejected the opinions on Drs. Hauser and Padilla in favor of the opinions of the non-examining agency doctors, Drs. Chiang and Gabaldon. (R. at 8–9; *see also* R. at 197–214 (Dr. Chiang), 218 (Dr. Gabaldon).) Setting aside the problem of

rejecting the opinions of the only evaluators who actually examined the claimant, including the treating physician, in favor of those who did not, the Court is not satisfied that these non-examining consultants considered Ms. Benavidez' morbid obesity and its effects on her mental impairments. Neither of these doctors ever saw Ms. Benavidez. (*See* R. at 197–214; R. at 218.). Most importantly, though, neither of their reports mentions her obesity, much less discusses its effects on her mental impairments. (*See* R. at 197–214; R. at 218.) The Court finds that the ALJ's decision to adopt the opinions of Drs. Chiang and Gabaldon is not supported by substantial evidence because their records do not indicate that they considered Ms. Benavidez' obesity.

### III. Credibility

In her *Motion*, Ms. Benavidez asserts that "the ALJ has offered no legitimate reason why he should be allowed to override the medical and psychological findings that support all of [her] complaints." (Pl.'s Mot., Doc. 16 at 14.) The Commissioner counters that the ALJ "discussed specific reasons for discounting Plaintiff's credibility" and urges the Court to affirm the credibility determination. (Def.'s Resp., Doc. 19 at 13.)

In evaluating the credibility of a claimant's subjective complaints, the ALJ follows the steps outlined in *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987). "If [an] impairment is demonstrated by objective medical evidence, the [ALJ] must consider the relationship between the impairment and the [symptoms] alleged" without regard to the claimant's credibility. *Luna*, 834 F.2d at 163; *see White v. Barnhart*, 287 F.3d 903, 909 n.3 (10th Cir. 2001). First, accepting as true the subjective allegations, the ALJ must determine whether the claimant has a medically determinable impairment that "could reasonably be expected to produce the *alleged* [symptoms]." *Luna*, 834 F.2d at 163 (emphasis in original). "If an

appropriate nexus does exist," the ALJ must next consider all of the relevant evidence "to determine whether the claimant's [symptoms are] in fact disabling." *Id.* The ALJ must consider "the medical data previously presented, any other objective indications of the degree of [the symptoms], and subjective accounts of the severity" in determining whether the ALJ believes the claimant. *Id.* That is, the ALJ must assess the credibility of the claimant's assertions of pain. *Id.* ALJs, however do not have to discuss "every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).

"Credibility determinations are peculiarly the province of the [ALJ, and courts] will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Svcs.*, 898 F.2d 774, 777 (10th Cir. 1990). "[I]t is well settled that [ALJs] must give reasons for their decisions." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988). Credibility findings, therefore, "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988). In deciding whether the ALJ believes the claimant about her pain, the ALJ should consider factors such as:

> [1] the levels of medication and their effectiveness, [2] the extensiveness of the attempts (medical or nonmedical) to obtain relief, [3] the frequency of medical contacts, [4] the nature of daily activities, [5] subjective measures of credibility that are peculiarly within the judgment of the ALJ, [6] the motivation of and relationship between the claimant and the other witnesses, and [7] the consistency or compatibility of nomedical testimony with objective medical evidence.

*Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993). "There is not a talismanic requirement that each factor . . . be addressed," however. *Id.*

Here, the ALJ applied the proper legal standard in assessing Ms. Benavidez' credibility. First, he found that Ms. Benavidez' "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." (R. at 18.) He then went on to find that her "statements regarding the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are not consistent with the [RFC]." *Id.* He explained his determination by applying several of the factors above. (R. at 21, 22.) For example, applying the first factor, the ALJ found that "medications have been relatively effective in controlling her symptoms." (R. at 22.) Applying the fourth factor, he found that her reports of daily activities are inconsistent with her subjective complaints (R. at 21) and that her functioning has improved with treatment (R. at 22). The ALJ also found that "no difficulties were observed [by the Social Security representative] such as with understanding, coherency, talking, answering, sitting, standing, walking, or using her hands," which corresponds to the fifth factor. (R. at 21.) Finally, applying the seventh factor, the ALJ noted that Ms. Benavidez had not been hospitalized for psychiatric reasons. (R. at 22.) Although the ALJ's decision reflects application of the proper legal standard, the Court notes that the credibility assessment may change on remand considering the errors outlined above.

## Conclusion

For the reasons stated above, the Court **FINDS** that the ALJ failed, in the RFC, to make adequate findings regarding the impact of Ms. Benavidez' obesity on her mental

impairments and that substantial evidence does not support his adoption of the non-examining medical opinions. Accordingly,

**IT IS HEREBY ORDERED** that Ms. Benavidez' *Motion to Reverse and Remand for a Rehearing with Supporting Memorandum* (Doc. 16) be **GRANTED** and that this case be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

_____
**THE HONORABLE CARMEN E. GARZA**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**